# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

PMT MACHINERY SALES, INC.,

                        Plaintiff,

v.                                                          Case No. 17-CV-1731-JPS

YAMA SEIKI USA, INC.,

                        Defendant.

---

## 1.    INTRODUCTION

Yama Seiki USA, Inc. ("Yama Seiki"), the defendant, is a manufacturer of machine tools and machining centers, and PMT Machinery Sales, Inc. ("PMT"), the plaintiff, sells those products in eastern Wisconsin. PMT filed this action in Milwaukee County Circuit Court alleging that Yama Seiki violated the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135.01 *et seq.*, when it terminated PMT's status as its exclusive dealer in eastern Wisconsin. *See* (Docket #1-1).

Yama Seiki removed the action to this Court on the basis of the Court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1). (Docket #1 at 2). Yama Seiki subsequently moved for summary judgment, and that motion is now fully briefed and ripe for adjudication. (Docket #23). For the reasons explained below, the motion will be granted and this case will be dismissed.

## 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to demonstrate a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

**3.     RELEVANT FACTS**

Consistent with the standard of review, the following facts are taken from the evidence when viewed in a light most favorable to PMT.

**3.1     Incorporation of PMT**

Yama Seiki is a California corporation that manufactures machine tools and machining centers. PMT is a Wisconsin corporation located in Franklin, Wisconsin. PMT's principal, Kenneth Schertz ("Schertz"), incorporated a company called Precision Automation, Inc. in or around 1997 as an independent machine tool repair and service business. Schertz

changed the corporate name in 2001 to Precision Machine Tool Corporation ("Precision") and added machinery sales to its offerings.

The first product line Precision added was Yama Seiki. There was no written agreement between Precision and Yama Seiki in 2001 to confirm Precision's sale of the Yama Seiki line; rather, it was simply a handshake deal. Precision sold Yama Seiki machines on a profit-for-sale basis, meaning that Precision would cultivate the customer, quote the machine to the customer, pay a dealer price to Yama Seiki for the machine, and keep as its profit the difference between the dealer price and the purchase price negotiated with the customer. Precision lost the Yama Seiki product line in 2008 when Yama Seiki assigned its Wisconsin sales to a different company, Progressive Machinery, Inc. ("Progressive").

In late 2015, Progressive lost the Yama Seiki product line. David Reesman ("Reesman"), who worked for Progressive, approached Schertz about forming a company to sell Yama Seiki machines, and Schertz agreed. In October 2015, Schertz incorporated PMT with a $20,000.00 start-up loan from Precision; PMT was incorporated separately from Precision so as to not put Precision at risk in the event selling Yama Seiki machines did not work out. Reesman became an employee of PMT and dedicated 90% of his time to the sale of Yama Seiki products.

### 3.2    Relationship Between PMT and Yama Seiki

Prior to the formation of PMT, Reesman discussed with Clive Wang ("Wang"), the general manager of Yama Seiki's Goodway division, the possibility of a newly-formed PMT selling the Yama Seiki line. Reesman then teamed up with Schertz to form PMT, and during that time Reesman's conversations with Wang continued.

After PMT was formed, Reesman asked Wang to grant an exclusive dealership to PMT. The parties disagree as to whether Wang verbally committed to giving PMT exclusive status starting at that time, which was around October or November 2015; Reesman and Schertz aver that Wang so promised, but Wang avers that he made no promise of exclusivity prior to December 2015. *See* (Docket #39 at 3).[1]

On December 30, 2015, Wang issued PMT an "exclusive letter of dealership" which offered an exclusive territory in eastern Wisconsin for the year 2016 to sell Yama Seiki-Goodway turning centers provided that PMT satisfied the following terms enumerated in the letter:

1. Meet sales requirements minimum at $1,000,000.00 or have sold 15 YS-Goodway units.

2. Dealer must not represent another competitor line that coincides with YS-Goodway machine line.

3. Must stock at least one YS-Goodway machine on dealer's showroom floor.

4. Having a marketing plan in promoting YS-Goodway machines.

5. Provide a weekly sales report to Yama Seiki.

(Docket #24-3).

PMT rejected the offer of exclusivity for Yama Seiki's Goodway line. It did not believe it could satisfy the conditions set forth in Yama Seiki's letter. Indeed, for the year 2016, PMT did not sell $1,000,000.00 of Yama

---

[1] In its reply brief, Yama Seiki argues that PMT's version of this fact is a "sham" because PMT would not have continued to ask for exclusivity if Yama Seiki had already promised it. (Docket #40 at 13–14). PMT subsequently filed a motion to "strike [Yama Seiki's] 'sham affidavit' argument." (Docket #41). Leaving aside the questionable propriety of such a motion, the Court need not substantively address it because Yama Seiki agreed to withdraw its "sham affidavit argument." (Docket #42). PMT's motion to strike will be denied as moot.

Seiki products or 15 YS-Goodway units, it did not stock one YS-Goodway machine on its showroom floor, and it did not develop a written marketing plan. Despite rejecting the offer of exclusivity for the Goodway line, PMT continued its sales efforts for both of Yama Seiki's lines—Goodway and Awea.

On February 8, 2016, Schertz advised Wang that he thought PMT "may be in a position to take 2 machines for our stock if it were to help you and [Yama Seiki] out." (Docket #28 at 8). As to these machines, and the prospect of a future agreement with Yama Seiki, Schertz said:

> The reward, for PMT, is to come to a dealer agreement with YSI which includes Goodway, Awea and parts in Wisconsin. I believe, at this time, I would like to write into our P.O. (or sub letter of interest) that final payment/transfer of ownership would be contingent on reaching such agreement. This gets the machines off your floor and gives us 6 months to reach agreement. In the event we do not come to agreement, YSI would take back machines and/or sell from PMT'[s] facility, loaded on truck, FOB YSI.

(Docket #28 at 8). Two months later, on April 2, Schertz sent an email to Yama Seiki conveying that PMT had no sales thus far. *Id.* In a letter attached to the email, PMT further advised that "[w]e will have a [Yama Seiki] machine tool order by May 31, 2016 or we will close down PMT sales" and "[w]e will have an exclusive agreement with [Yama Seiki] by May 31, 2016 or we will close down PMT sales." *Id.*

On July 11, 2016, PMT submitted to Yama Seiki an "application" for exclusive dealership status in eastern Wisconsin for all Yama Seiki products, including both its Goodway and Awea product lines. Schertz asked "to meet with president and final decision maker of Yama Seiki, USA to work out the details" and "[b]eing reasonable people, with a little give

and take, I am confident that we can come to a mutual agreement beneficial to [Yama Seiki], PMT and, most important to me, THE CUSTOMER." *Id.* Schertz concluded the application by stating that "[i]n the unfortunate, yet realistic, circumstance that we do not come to an agreement, I feel it best for me to dissolve PMT Machinery Sales and concentrate on my service company." *Id.*

> On July 12, 2016, Wang from Yama Seiki responded:

> Ken,
> I am not sure if you are aware that you are in "exclusive" status for the Goodway turning. So now you know who is treating you guys better and believe in you guys more. We are "hoping" and "expecting" PMT is doing the same to [Yama Seiki]-Goodway in return. (by selling more turning centers to keep this "exclusive" status.)

*Id.*; (Docket #24-8). This email from Wang was the first time PMT became aware that Yama Seiki had been treating it as Yama Seiki's exclusive dealer in eastern Wisconsin. Schertz testified at his deposition that he believed, at that point, PMT had an exclusivity agreement with Yama Seiki, the terms of which

> were open-ended. There was no performance quotas, there was no billing preferences. There was just "I'm exclusive." And any other details, "Well, we'll cross that bridge when it comes to it." Basically, I assumed it was just an agreement, the letter that I wrote, which didn't really specify anything. I thought we were going to get together with Edward [Yama Seiki decision maker] to get some specific terms, which quotas may have come up. I didn't have any quotas in mind. The billing would have come up. We would have worked something like that out. You know, anything else that would have come up at the meeting.

*Id.* at 9; (Docket #24-1 at 35–36).

More than a year went by, and on October 25, 2017, Reesman emailed Wang questioning whether PMT remained exclusive because PMT had learned that other sales representatives for Yama Seiki had been contacting potential customers in eastern Wisconsin. Wang responded:

> You are not exclusive distributor in 2017 based on the letter I provided to you in 2015. In 2015 I provide a letter with certain requirements to you. See attachments. We hope you will also agree with the proposed letter to keep your exclusive but it seems you did not agree to all the requirements in the past. You know you have to meet those criteria to remain exclusive distributorship for the year 2016.
>
> 1. Meet sales requirements minimum at or have sold 15 YS-Goodway units.
>
> 3. Must stock at least one YS-Goodway machine on-dealer's showroom floor.
>
> Please understand that we cannot give "exclusive" unconditionally forever. So here is the answer if you want the clarification. You know we like to work with you and trust you so this is the only reason your information is still showing on our website. [A different dealer] did ask us several times for the exclusive in entire Wisconsin but we did not agree.

(Docket #28 at 9–10; #24-9).

Reesman resigned from PMT employment on January 20, 2018. After Reesman's resignation, PMT engaged the services of Rick Rojek ("Rojek") as a sales representative for PMT to sell Yama Seiki products. Rojek works on a commission basis. As of the time of the parties' summary judgment filings, PMT retained the ability to sell Yama Seiki products, albeit on a non-exclusive basis.

### 3.3. PMT's Investment in Yama Seiki Products

To secure a sale of a Yama Seiki product, PMT would obtain a dealer price from Yama Seiki and then negotiate a purchase price with the

customer. The customer would then place its order directly with Yama Seiki, and the terms of sale would be all Yama Seiki's terms, apart from the purchase price that had been established between PMT and the customer. PMT never received any polices or procedures from Yama Seiki that governed PMT's sale of Yama Seiki products. When PMT made a Yama Seiki machine sale, PMT would be responsible for installation, training, and warranty service for the machine. PMT would then subcontract that work to Precision. PMT's compensation for its promotion, sale, installation, training, and warranty work for Yama Seiki machines was the difference between dealer price and the price ultimately negotiated with the customer.[2]

From January 1, 2015 through May 16, 2018, PMT's total income by customer from the sale of Yama Seiki products was $235,389.55, which is about 55% of its overall income by customer for that period. PMT states that it derived 74% of its gross profits in 2016 and 50% of its gross profits in 2017 from the sale of Yama Seiki products.[3] PMT sold a total of twelve Yama Seiki machine tools. PMT was one of three dealers in the United States to receive Yama Seiki's top performer award in 2017. PMT claims that it was preparing to ramp up its sales efforts as a result of its 2017 performance; for example, it was in the process of hiring another sales person.

From January 1, 2015 through May 16, 2018, PMT's total advertising and promotional expenses were $3,803.14. Of this, $1,200 was spent in

---

[2]PMT says this compensation model is "similar" to the profit-for-sale model by which Precision had been paid, but not the same. (Docket #28 at 3, 11–12). Any distinction appears to be without a difference. *See* (Docket #24-1 at 15).

[3]Exactly how much of PMT's profits came from the sale of Yama Seiki sales is not clear from the parties' evidence; however, any ambiguity or dispute is not material to the resolution of the instant motion.

promotion of Yama Seiki; PMT made two installment payments of $600 for a trade journal advertisement in collaboration with Yama Seiki.

In 2016, PMT attended a machine tool trade show in Chicago using exhibitor passes paid for by Yama Seiki. Schertz and Reesman spent time in the Yama Seiki booth developing leads for the sale of Yama Seiki products in Wisconsin. PMT also attended the dealer's dinner that Yama Seiki held at the trade show as Yama Seiki's Wisconsin dealer. PMT states that, consistent with its efforts to ramp up Yama Seiki sales following its 2017 success, it reserved space at the next Wisconsin machine tool show for the purpose of promoting Yama Seiki machine tools.

 PMT paid monthly rent of $500 to Precision for approximately 600 square feet of second-floor space in a building that Precision leased. The office space has its own address and utilities. PMT did not maintain an inventory of Yama Seiki machine tools, and it did not maintain parts that would be necessary for installation or warranty work on Yama Seiki machines. Instead, Precision maintained an inventory of parts to support Yama Seiki products through installation and warranty work.

PMT did not maintain its own website; it was listed only as a part of the Precision website. The PMT sales portion of Precision's website indicates that it is a "full service distributor of CNC Machine Tools and proudly offers a full line of machinery from the following builders: Yama Seiki and Enshu Japan." (Docket #28 at 10–11). Yama Seiki listed PMT as its dealer on Yama Seiki's website.

4.  **ANALYSIS**

On these facts, PMT alleges that Yama Seiki has violated PMT's rights under the Wisconsin Fair Dealership Law ("WFDL"). (Docket #1-1). The WFDL governs "dealerships," which are defined by the statute as

"contract[s] or agreement[s]" entered into between "grantors" and "dealers." Wis. Stat. §§ 135.02–135.025. The WFDL imposes certain obligations on grantors with respect to dealership relationships. For instance, grantors are prohibited from "terminat[ing], cancel[ling], fail[ing] to renew or substantially chang[ing] the competitive circumstances of a dealership agreement without good cause," *id*. § 135.03, and, generally speaking, must provide "at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances." *Id*. § 135.04.

PMT alleges that Yama Seiki made a substantial change to the competitive circumstances of PMT's dealership, in violation of Section 135.03, by allowing another dealer to sell Yama Seiki products in PMT's exclusive territory. *Id.* at 6–7. Further, PMT alleges that to the extent Yama Seiki claims it acted with good cause, Yama Seiki failed to provide notice and opportunity to cure in violation of Section 135.04. *Id.* at 7.

Yama Seiki moved for summary judgment based on a single theory: the relationship between Yama Seiki and PMT is not a "dealership" for the purposes of the WFDL. If this is true, PMT can raise no legal complaint about Yama Seiki ending PMT's status as the exclusive seller of its products in eastern Wisconsin. *See Frieburg Farm Equip., Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir. 1992) (business relationships other than dealerships not protected by the WFDL).

Whether a business relationship constitutes a "dealership" under the WFDL is "a recurring question for courts in Wisconsin . . . in part because the definition of 'dealership' in the WFDL is 'both extremely broad and highly nuanced.'" *Benson v. City of Madison*, 897 N.W.2d 16, 27 (Wis. 2017)

(citations omitted). There is "rarely an obvious answer" to the question of whether a business relationship amounts to a dealership. *Id.*

> Under the WFDL, "dealership" is defined as:
>
> a contract or agreement, either express or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3). To determine whether this definition is satisfied, Wisconsin courts typically address the statutory language in three parts: (1) the existence of a contract or agreement between two or more persons; (2) by which a person is granted one of the rights specified, namely a right to sell or distribute goods or services or right to use a trademark or other commercial symbol; and (3) in which there is the requisite "community of interest." *Benson*, 897 N.W.2d at 27.

Yama Seiki argues that none of these elements are present in this case. As to the first, Yama Seiki argues that the parties did not have a meeting of the minds as to the essential terms of their relationship (primarily the exclusivity component), and therefore they could not have had a valid agreement. As to the second element, Yama Seiki argues that PMT did not have a right to sell or distribute Yama Seiki products or to use Yama Seiki's trademark in a way that connotes a "dealership." As to the third element, Yama Seiki argues that PMT did not have a community of interest with Yama Seiki because, *inter alia,* it has not made a significant financial investment to sell Yama Seiki products, the parties' relationship was relatively new, there were essentially no terms or quotas imposed by

Yama Seiki on PMT, and PMT did not engage in cooperative and coordinated sales efforts with Yama Seiki in a way that demonstrates interdependence.

The Court agrees with Yama Seiki that the second element of the "dealership" definition is not met in this case; that is, PMT did not, for purposes of the WFDL, have the right to "sell or distribute goods or services" of Yama Seiki or the right to "use a trade name, trademark, service mark, logotype, advertising or other commercial symbol" of Yama Seiki. Wis. Stat. § 135.02(3). Because failure to satisfy this element of the dealership definition is fatal to PMT's claims, the Court need not wade unnecessarily into Wisconsin law to decide whether the other two elements of a dealership are present here.

### 4.1    Right to Sell or Distribute the Grantor's Products

PMT argues that it indeed has authority to sell or distribute Yama Seiki products by soliciting customers and connecting them with Yama Seiki to place their orders. Yama Seiki counters that PMT is not authorized to sell Yama Seiki products directly or bind Yama Seiki to a sale. Yama Seiki instead likens PMT to a manufacturer's representative who is not entitled to the protections of the WFDL.

Wisconsin courts have characterized "the right to sell or distribute" under the WFDL "variously (but not necessarily exhaustively) as the 'unqualified authorization to transfer the product at the point and moment of the agreement to sell' or the 'authority to commit the grantor to a sale.'" *Benson*, 897 N.W.2d at 29 (quoting *Foerster, Inc. v. Atlas Metal Parts Co.*, 313 N.W.2d 60, 64 (Wis. 1981)); *see also John Maye Co. v. Nordson Corp.*, 959 F.2d 1402, 1406 (7th Cir. 1992) (the "most important factor . . . is the dealer's

ability to transfer the product itself (or title to the product) or commit the grantor to a transaction at the moment of the agreement to sell.").

A manufacturer's representative does not fit within this component of the definition of a dealer. A manufacturer's representative is "'an independent contractor who solicits orders for a manufacturer's product from potential customers and is paid a commission on resulting sales.'" *John Maye Co.*, 959 F.2d at 1408 *(quoting M. Bowen & B. Butler, The Wisconsin Fair Dealership Law, § 3.13, at 3–18 (1988))*. Therefore, courts applying the WFDL routinely exclude manufacturer's representatives from its protections. *See John Maye Co.*, 959 F.2d at 1408 (citing cases).

The discussion of the right to sell in *Foerster, Inc.* illustrates this distinction. Foerster, Inc. ("Foerster") was a Wisconsin sales corporation that promoted the sale of Atlas Metal Parts Company ("Atlas") products in exchange for a commission on the resulting sales. *Foerster, Inc.*, 313 N.W.2d at 61–62. Foerster did not have authority to transfer Atlas products or to commit Atlas to a sale, but it was responsible for servicing a customer after delivery. *Id.* Atlas furnished Foerster with advertising brochures, business calling cards, and models of its products. Foerster expended no money for advertising Atlas' products, maintained no supply or inventory of Atlas' products, paid no fee to Atlas, and made no investment in Atlas. *Id.* During the relevant timeframe, Foerster also promoted the products for at least four other companies. *Id.*

Based on these facts, the Wisconsin Supreme Court held that Foerster was not entitled to the protections of the WFDL as a "dealer" because, among other reasons, it did not have the right to sell Atlas' products. *Id.* 66–67. The court contrasted Foerster with the kinds of dealers the law was meant to protect:

In the case of gasoline service stations or fast food establishments, the right to sell consists of an unqualified authorization to transfer the product at the point and moment of the agreement to sell as contrasted to a more limited right to sell in farm implement dealerships where the right generally includes authority to commit the grantor to a sale and differs from the facts in this case, as here there is no authority to commit the grantor to a sale.

*Id.* at 64. In other words, the court acknowledged that a broad range of entities may be considered dealers under the law (from gas stations to farm implement sellers) and different types of dealers have varying degrees of authority in terms of consummating a sale (immediately transferring title versus binding the grantor to sale terms that the grantor would then effectuate). But at minimum, in order to qualify for protection under the WFDL, an alleged dealer itself must have authority to commit the grantor to a sale.

The Seventh Circuit has since applied this rule from *Foerster* to cases indistinguishable in all relevant respects from this case at bar. In *John Maye Co.,* for example, the plaintiff, John Maye Company ("Maye") was a Wisconsin corporation that sold packaging machinery, and the defendant, Nordson Corporation ("Nordson"), was an Ohio corporation that manufactured packaging machinery. 959 F.2d at 1404. The two companies entered into a sales representation agreement which designated Maye as Nordson's "representative" and required it to "actively promote the sale and acceptance" of Nordson products in its assigned, non-exclusive territory. *Id.* Maye would transmit customer orders or inquiries to Nordson for approval, and Nordson would determine how much to charge for its products. *Id.* at 1404–05. Nordson had "sole discretion" to accept or reject any order. *Id.* Once a contract was formed, Nordson shipped products

directly to the customer, transferring title from itself to the buyer. *Id.* Maye was compensated by commission on each sale it helped procure. *Id.*

Maye did not pay a fee to Nordson under their sales agreement and did not pay to advertise Nordson products. Instead, Nordson supplied Maye with literature, samples, and other material necessary for promoting Nordson products. *Id.* Though not required to do so, Maye maintained an inventory of spare parts for Nordson machines. *Id.* After a sale, Maye performed both warranty and non-warranty work on Nordson machines, doing the warranty work for free but at times charging for non-warranty work. *Id.* It also trained customers in the upkeep of Nordson equipment. *Id.*

Three years after entering into the sales representation agreement with Maye, Nordson terminated it in favor of using a direct sales force in Maye's sales territory. *Id.* Upon receiving notice of the impending termination, Maye filed a lawsuit alleging a claim under the WFDL and moved the court for a preliminary injunction. *Id.* The district court denied Maye's motion for a preliminary injunction, finding he did not have a reasonable likelihood of success on the merits of his claim because he was not a "dealer" for purposes of the WFDL. *Id.*

The Seventh Circuit agreed. It explained that the "single most important factor" in determining whether an alleged dealer has a "right to sell" under the WFDL is "the dealer's ability to transfer the product itself (or title to the product) or commit the grantor to a transaction at the moment of the agreement to sell." *Id.* at 1406. Maye had no such authority. Maye urged the court to consider the totality of the circumstances, pointing out that it occasionally modified prices, assumed credit risk for lesser sales, installed and serviced equipment after delivery, and maintained an inventory of spare parts. *Id.* The court rejected this argument, finding that

a right to sell under the WFDL cannot exist if the alleged dealer is not authorized to commit the grantor to a sale. *Id.* at 1407–08. Although Maye had "a great deal of contact with customers in soliciting business for Nordson, submitted orders for Nordson's approval, and did warranty work on Nordson products free of charge," the court explained, "there is no evidence that it had the ability to bind Nordson to a sale at the moment a customer agreed to buy. Absent this crucial authority, Maye does not have the right to sell under the WFDL." *Id.* at 1408.

PMT's relationship with Yama Seiki is similar to Maye's relationship with Nordson and Foerster's relationship with Atlas; that is, PMT did not directly sell Yama Seiki machines to end user customers, and PMT had no authority to commit Yama Seiki to a sale. All customer orders were placed with Yama Seiki directly, and Yama Seiki billed the customer directly. Yama Seiki also shipped the product and transferred title of the machine to the customer according to Yama Seiki's terms of sale. PMT did not maintain an inventory from which it sold Yama Seiki products.

Like Maye, PMT asks this court to consider the totality of circumstances surrounding its relationship with Yama Seiki to find that it is a dealer for purposes of the WFDL. PMT points out that it contributed $1,000 toward a joint advertisement with Yama Seiki, used the Yama Seiki logo on its website, received a weekly confidential pricing list from Yama Seiki, and performed training, installation, and warranty work on Yama Seiki products. Although these things demonstrate at least a limited investment in the Yama Seiki line, they do not change the fact that PMT did not have authority to sell Yama Seiki products directly. *Id.* at 1408 ("That Maye did more than required by the contract is insufficient to demonstrate a modification and a right to sell, as 'the performance of additional service-

type functions by a manufacturer's representative does not suffice to bring one which neither sells nor distributes goods within the meaning of the WFDL.'") (*quoting E.A. Dickinson & Assocs. v. Simpson Elec. Co.,* 509 F. Supp. 1241, 1245 (E.D. Wis. 1981)).

PMT makes much of the fact that it negotiated sales prices with customers and Yama Seiki never changed a price that PMT negotiated. But PMT does not claim to have any authority over the dealer price, meaning that Yama Seiki had the sole authority to determine how much it would receive for the sale of a given product. The price PMT negotiated above Yama Seiki's dealer price affected PMT's compensation on the sale, but it did not affect Yama Seiki's income.

PMT also points out that when a potential customer did not want to be subject to the terms of Yama Seiki's sales contract, PMT's sister company would purchase the product from Yama Seiki at dealer price and resell it to the customer. But Precision is not a plaintiff in this case. Further, leaving to the side the fact that it was Precision, not PMT, who bore the risk in those instances, PMT does not indicate how often this happened, and the Court is left with the impression that it was the exception and not the rule. Precision's infrequent practice of taking on the risk of purchasing a machine for immediate resale to an identified customer does not change the overall nature of the relationship between PMT and Yama Seiki. *Cf. Wilburn v. Jack Cartwright, Inc.,* 719 F.2d 262, 265 (7th Cir. 1983) ("Where a dealer purchases goods for resale, he makes the sort of substantial investment contemplated by the WFDL; however, where a sales representative merely solicits orders that are subject to the manufacturer's approval, no such investment has occurred.").

In sum, the Court agrees with Yama Seiki that because PMT was not authorized to transfer products itself or commit Yama Seiki to a sale, it did not have a "right to sell or distribute" Yama Seiki products for purposes of the WFDL.

### 4.2    Right to Use the Grantor's Commercial Symbol

PMT also claims to be a dealer because it is authorized to use Yama Seiki's trademark and trade name.[4] Dealers must make "prominent use of a grantor's trademark to qualify under the WFDL, such use that the public associates the dealer with the trademark." *John Maye Co.*, 959 F.2d at 1409.

The Wisconsin Supreme Court's decision in *Foerster* again provides a helpful starting point. In that case, Atlas provided Foerster with business calling cards and advertising brochures. 313 N.W.2d at 66. Foerster used the cards and brochures only to inform potential customers of its status as Atlas' representative. *Id.* Atlas did not authorize Foerster to use its trademark in any other way and Foerster did not independently advertise Atlas' products. *Id.* Based on these facts, the court determined that Foerster had no right to use Atlas' trademark. In so finding, the court distinguished Foerster's "extremely limited use" of Atlas' commercial symbols from a dealer's use of a grantor's commercial symbol in a typical dealership relationship:

---

[4]PMT's discussion of its authorization to use Yama Seiki's commercial symbols is essentially limited to one footnote. (Docket #27 at 1). For this reason alone, the Court could find that PMT has not met its burden to stave off summary judgment on this element of its claim. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.") (quotation and internal marks omitted); *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 335 n.8 (7th Cir. 2010) (underdeveloped arguments are waived).

> In the situation of the service station, fast food franchise, machinery distribution or clothing retailer, the trademark of the grantor or of the dealership is often prominently displayed for several purposes, including as an implicit guarantee of a certain quality of product and service, frequently supported by the grantor's national or statewide advertising. While the product may be that of the grantor, the dealer often uses the trademark to imply that his establishment furnishes the type of quality service associated with the grantor.
>
> In contrast, Foerster, Inc., used the Atlas logo on business cards only for the purpose of informing potential clients of his status without any notation as to the nature of the relationship. The fact that he was not allowed to adopt the trademark or symbol as his own is demonstrated by the fact that the card Atlas supplied to Foerster, Inc., identified Foerster in bold type in the center of the card with Foerster's phone number and at the bottom left hand corner in smaller type identified Atlas with a separate phone number.

*Foerster, Inc.*, 313 N.W.2d at 66. More than the mere use of a calling card identifying a manufacturer's representative is required for a finding that a representative is a dealer. *Id.* at 67.

The *John Maye Co.* court further expounded on the difference between *de minimis* use of a grantor's trademark and prominent use that qualifies the dealer for protection under the WFDL. Prominent use includes, for example, owners of a Walgreen's drugstore paying for advertising using the Walgreen's trademark, paying for a large Walgreen's sign in the front of its store, and paying for large Walgreen's signs and labels used within the store. *John Maye Co.*, 959 F.2d at 1408–09 (citing *Kealey Pharmacy & Home Care Serv. v. Walgreen Co.*, 607 F. Supp. 155, 165-66 (W.D. Wis. 1984), *aff'd in part and vacated in part* 761 F.2d 345 (7th Cir. 1985)). This

sort of prominent use of a grantor's trademark causes the public to associate the dealer with the trademark. *John Maye Co.*, 959 F.2d at 1409.

Conversely, a dealer's minor investment in a grantor's trademark "is unlikely to place the grantor in such a superior bargaining position that it could extract concessions from an unwilling dealer, and so the dealer does not need the protection of the WFDL." *Id.* An example of non-qualifying, *de minimis* use of a grantor's trademark includes using business cards and pamphlets supplied by the grantor and bearing the grantor's trademark, but "not prominently display[ing] the logo as a[n] implicit guarantee of quality" and "not spend[ing] money on advertising." *Moodie v. Sch. Book Fairs, Inc.*, 889 F.2d 739, 743 (7th Cir. 1989); *see also Van Groll v. Land O'Lakes, Inc.*, 310 F.3d 566, 570 (7th Cir. 2002) (plaintiff found not to be a dealer where grantor paid the cost of putting its logo on plaintiff's truck and provided plaintiff with a uniform bearing grantor's logo, which plaintiff was required to wear); *Rakowski Distrib., Inc. v. Marigold Foods, Inc.*, 193 F.3d 504, 507 (7th Cir. 1999) (plaintiff found not to be a dealer where he had the grantor's logo on his truck, for which he paid part of the installation cost, and handed out the grantor's business cards); *Wilburn,* 719 F.2d at 265 (plaintiff found not to be a dealer where he ran only one advertisement for grantor's goods and placed a sticker with his name and address on grantor's catalogs).

Simply put, defining "dealership" in terms of trademark use "is meant to protect against situations in which a dealer spends money advertising for or promoting a company, an investment that is lost when the company terminates the relationship." *Van Groll*, 310 F.3d at 570.

PMT's use of Yama Seiki's trade name and logo does not rise to this level. Yama Seiki provided PMT with machine promotional brochures and allowed PMT to use the Yama Seiki logo on the PMT page of the Precision

website (where it also displayed the Enshu logo). PMT did contribute $1,200 toward one joint advertisement with Yama Seiki in a trade journal, but this appears to be the only financial expenditure PMT made on advertising for Yama Seiki. It is also a very small amount in comparison to the value of the sales that were made or contemplated. PMT also attended a machine tool trade show using Yama Seiki exhibitor passes, but there is no evidence that PMT linked itself in any significant way to Yama Seiki at the trade show beyond spending time in the booth that Yama Seiki maintained. Under the controlling precedent described above, this use of Yama Seiki's trade name and logo does not satisfy the requirements of the WFDL.

**5.      CONCLUSION**

The single issue presented to the Court by Yama Seiki's motion for summary judgment is whether PMT qualifies as a "dealer" for purposes of claiming protections under the WFDL. PMT has not raised a triable issue as to whether it has either a right to sell or distribute Yama Seiki goods or a right to use Yama Seiki's commercial symbol in a manner contemplated by the WFDL. PMT is therefore not a dealer under the WFDL and its claims arising under that law must fail. Yama Seiki's motion will be granted, and this case will be dismissed.

Accordingly,

**IT IS ORDERED** that PMT Machinery Sales, Inc.'s motion to strike (Docket #41) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Yama Seiki USA, Inc.'s motion for summary judgment (Docket #23) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 2nd day of November, 2018.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge